August 18, 1977

## 77-47 MEMORANDUM OPINION FOR THE SECRETARY OF AGRICULTURE

### Price Support for Sugar Producers—Agriculture Act of 1949

This is in response to your request for our opinion whether the proposed price support program for sugar is authorized under the Agricultural Act of 1949, as amended.

I

The program is set forth in proposed regulations that were published in the Federal Register on June 14, 1977. The program, as we understand it, would function in the following way:

At the close of each marketing quarter the Agricultural Stabilization and Conservation Service (ASCS) would make a cash payment to each eligible processor who had marketed refined beet sugar or raw cane sugar during the quarter, if the "national average price" of refined beet sugar or raw cane sugar had been less than 13.5 cents per pound for the quarter. The amount of the payment would be determined by applying a rate to the number of pounds of sugar that the eligible processor had marketed during the quarter. The rate would equal the difference between (1) the "national average price" of processed sugar for the quarter, and (2) 13.5 cents per pound; but it would not exceed 2 cents per pound.

A processor would be eligible to receive a quarterly payment if, but only if, he had entered into a written contract with each producer who had provided him with unprocessed sugar beets or sugarcane for the quarter, and the contract had prescribed (1) that the producer would receive an agreed share of the proceeds generated from the sale of the processed product, and (2) that the processor would pay the producer the full amount of any ASCS payment received by the processor on account of the sale, less any administrative expenses incurred by the processor in connection with receiving and forwarding the ASCS payment.

In short, the proposed program would provide producers of sugar beets and sugarcane with supplemental cash payments, pegged to production and to the differential between the market price for sugar and 13.5 cents per pound, which payments would be channeled to them through the processors.

The program would assure that producers receive an aggregate return on sugar beets and sugarcane in excess of that which the processors themselves could afford to pay in light of the current market prices for processed sugar. In addition, the program would encourage continued production of sugarcane and sugar beets and would thereby stabilize the market. The question is whether the Act authorizes a program of this kind.

## II

The Act authorizes the Secretary of Agriculture to provide "price support" to the producers of certain nonbasic agricultural commodities, including sugar beets and sugarcane. 7 U.S.C. § 1447. The Act specifies that the Secretary shall provide this support, if at all, through "loans, purchases, or other operations." *Id.*

The proposed program would not provide price support to producers through "loans" or "purchases." The issue thus is whether it would provide price support to producers through "other operations." The Act does not define this term, and we know of no court decision that defines it. "Other operations" are operations other than loans or purchases, but the phrase is otherwise unknown to the law. Legislative history is the only guide.

First, whatever the extent of the Secretary's authority to provide price support to producers through "other operations," it is clear that Congress did not intend to give the Secretary authority to make direct payments to producers to compensate them for shortfalls in the market price of a nonbasic commodity, where that price is otherwise unsupported. It is clear that the Secretary was to have no authority to make "production payments," and while that term was given no precise definition in the legislative history, it was understood to refer generally to direct payments to producers (other than payments made pursuant to loans or purchases) in circumstances where the market price of their produce was unsupported and the payments were prompted by a shortfall in the price. Hearings Before the Senate Committee on Agriculture and Forestry on Farm Price-Support Program, 81st Cong., 1st Sess. 120–21 (1949); S. Rep. No. 1130, 81st Cong., 1st Sess. 4 (1949).

Second, there is some evidence that the Act was intended to provide the Secretary with authority to make direct payments to *processors* (other than in connection with loans or purchases) as a means of providing price support to producers in certain circumstances. At least one Senator took that view during the hearings on the relevant bills. Senator Anderson stated that if the price of an *unprocessed* commodity

were supported by other means, the Secretary would have authority to make compensatory payments to processors to defray the expenses incurred by them in paying the support price, provided the market prices for the *processed* commodity were so low that the processors could not otherwise afford to pay the support price. He stated that a program of this kind would be an example of one of the "other operations" by which the Secretary could provide price support to producers. Our research discloses that Senator Anderson's example is the only such example given in the legislative history. Hearings, *supra,* at 120.

It should be noted that Senator Anderson's interpretation is supported to some extent by the language of the Act itself. The Act suggests that, in fact, a price support operation may involve payments to processors. The Act does not describe the circumstances in which these payments may be made. It simply states that whenever a price support operation is carried out through "purchases from or loans *or payments to processors*" [emphasis added], the Secretary shall receive assurances from the processors that producers will receive "maximum benefit" from the operation. 7 U.S.C. § 1421(e).

### III

In light of the legislative history, the question might be resolved by determining the extent to which the proposed program resembles or differs from the two nonpurchase, nonloan programs that are described in the legislative history: (1) the program of "production payments," which the Act prohibits; and (2) the program of compensatory payments to processors, described by Senator Anderson, which the Act perhaps permits.

It is our opinion that there would be no distinction in substance between the proposed program and a program of "production payments." It is true that there would be a distinction in form: the payments would be made, not to the producers directly, but to processors, as forwarding agents for the producers. But the effect of the program would be precisely the same as the effect of a program of production payments. The market price for the processed commodity would float; the producers' share of that price would be determined by private agreement in an otherwise unsupported market; and the ASCS payments would be made, where necessary, to subsidize the producers on account of shortfalls in the market price.

On the other hand, there would be a significant difference between the proposed program and a program such as the one suggested by Senator Anderson. A program of that kind would presuppose that processors would pay a support price for the unprocessed commodity. Payments to the processors would then be made, not to subsidize the producers, but to compensate the processors for the additional costs incurred by paying the support price. The proposed program, in contra-

distinction, would have no short-run impact upon the prepayment price of the unprocessed commodity.[1] That price would be unsupported in the short run; and payments to the processors would be made for the purpose of subsidizing the producers, protecting them from the depressed market.

In short, the proposed program is indistinguishable from a program of production payments, which the Act prohibits; and it is distinguishable in substance from the one program that the legislative history puts forward as an example of an authorized "other operation." It is true that there would be a formal similarity between the proposed program and a program of compensatory payments to processors, but considerations of substance must override considerations of form to the extent that they may conflict. Accordingly, it is our conclusion that the proposed program is unauthorized. In the face of the clear expression of· congressional intent with regard to production payments, a program of indirect payments to producers is not one of the "other operations" that the Secretary is authorized to employ. We do not wish to suggest, however, that price support to producers may never be provided by means of direct payments to processors, but if it is to be so provided, the processors must act as something more than forwarding agents for payments that are otherwise indistinguishable from production payments.

Finally, without question, payments made under the proposed program would tend to stabilize the market, inasmuch as they would encourage producers to remain in the market; however, the same would be true if the payments were to be made to the producers directly.

For the reasons given above, we conclude that the program is prohibited under the Agricultural Act of 1949, as amended.

PETER F. FLAHERTY
*Deputy Attorney General* [2]

---

[1] In light of the absence of any direct impact upon the prepayment price of the unprocessed commodity, the argument could be made that the proposed program is not authorized under the Act for the simple reason that it does not provide "price support." We have not found it to be necessary to accept or reject that argument in determining whether the proposed program is an authorized "other operation."

[2] This opinion was prepared by the Office of Legal Counsel.